## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DOUG H. STROTT,                    )
                                   )
            Plaintiff,             )
                                   )
      v.                           )        2:13cv1245
                                   )        **Electronic Filing**
DIMENSIONAL INVESTMENT,            )
LLC HEALTH & WELFARE PLAN          )
and PRUDENTIAL INSURANCE           )
COMPANY OF AMERICA,                )
                                   )
            Defendants.            )

## MEMORANDUM OPINION

March 23, 2015

## I.    INTRODUCTION

Plaintiff, Doug H. Strott ("Strott" or "Plaintiff") initiated this action against Defendants,

Dimensional Investment, LLC, Health and Welfare Plan (the "Plan"), and Prudential Insurance

Company of America ("Prudential") (collectively "Defendants") seeking review of Prudential's

termination of his long-term disability ("LTD") benefits under Dimensional Investment LLC's

("Dimensional") employees benefit plan pursuant to § 502(a)(1)(B) of the Employee Retirement

Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).    The parties have filed Cross-

Motions for Summary Judgment, and for the reasons that follow, the Court will grant Strott's

Motion for Summary Judgment and deny Defendants' Motion for Summary Judgment.

## II.    STATEMENT OF THE CASE

Strott was employed by Dimensional, a Texas Corporation, as Regional Director from

October 1, 2007 until February 23, 2010.  Strott's Concise Statement of Undisputed Material

Facts ("Strott's CSUMF") ¶ 1; Defendants' Statement of Undisputed Material Facts

("Defendants' SUMF") ¶¶ 13 & 14. As a Dimensional employee, Strott was a participant in Dimension's employee welfare plan which provided LTD coverage and was governed by ERISA. Strott's CSUMF ¶ 2; Defendants' SUMF ¶¶ 1 & 2. Dimensional is the Plan Administrator, and Prudential is the Plan's Claims Administrator. Defendants' SUMF ¶¶ 3 & 4.

Strott was diagnosed with Scheuermann's Disease at the age of seventeen. Strott's SUMF ¶ 19. Scheuermann's Disease is a condition caused by abnormal blood flow to spinal vertebrae which can cause pain and a mechanical breakdown of the spine leading to early degeneration of the spine. *Id.* Strott had surgeries resulting from his condition in 2007 (L5 foraminal laminectomy), June 2008 (cervical anterior fusion C3-C7), and in September 2009 (anterior and posterior lumbar fusion L4-S1). Strott's CSUMF ¶ 20.

On January 11, 2010, Strott was examined by Jason E. Lowenstein, M.D. ("Dr. Lowenstein"), a spinal surgeon, who noted that Strott "may benefit from a revision and proximal extension of his fusion up across that upper lumbar Scheuermann disease to try to address that severe kyphosis and degeneration. Strott's CSUMF ¶¶ 21 & 24. Dr. Lowenstein formed a plan to complete a revision of the C2-T2 decompression and fusion, and planned an eventual revision of the previous lumbar fusion after Strott's cervical recovery was underway. Strott's CSUMF ¶ 21. Strott had a spinal fusion and C2-T2 scheduled for February 24, 2010, and he filed an application for disability benefits under the Plan on February 22, 2010. Strott's CSUMF ¶ 25; Defendants' SUMF ¶ 14. On February 24, 2010, Strott underwent a spinal fusion at C2-T2. Defendants' SUMF ¶ 15.

In considering Strott's application for short-term disability ("STD") benefits, Prudential noted: "Plaintiff's estimated return to work date was March 22, 2010, 4/8 weeks during med supports impairment to 3/21/10 for 4 weeks post-op until return to work plans received." Strott's CSUMF ¶ 29. On April 9, 2010, Prudential noted that Strott had "20 screws in his neck on

"2/24/10-neck fusion" and extended Strott's STD to May 25, 2010, the maximum duration of time under the Plan. Strott's CSUMF ¶ 30. On April 12, 2010, Prudential further noted that Strott: "can't do physical therapy until 2 months. Still in neck brace-Treating with Lowenstein . . . On 3/25/10 was advised that in June [Strott] will have lumbar fusion. In June/July 2008, had cadivers (sp?) (sic) put in back. Went out to work in Sept. for lower back and didn't take. Now is having revision of lumbar fusion." Strott's CSUMF ¶ 32. In evaluating Strott's potential transition to LTD, Prudential noted on April 20, 2010, Strott's surgical history including: "2/24/10 neck fusion w/20screws, 9/15/09 lumbar Sx, 7/08 cadiver (sp?) implant in back." Strott's CSUMF ¶ 33. By letter dated April 22, 2010, Prudential approved Strott's LTD benefits[1] effective May 25, 2010. *Id.*; Defendants' SUMF ¶ 18. Further, on April 29, 2010, Prudential noted:

> Given that this will be his 2nd lumbar fusion, and now add in a cervical fusion, to me return to sustained Light (demand work) is guarded. Just the static sitting while flying would be a problem, not to mention frequent standing/walking/lifting 20#. ND after Lumbar fusion about 12 weeks. We'll have a better idea after that but you may want to talk to him about VR now.

Strott's CSUMF ¶ 36.

On May 17, 2010, Dr. Lowenstein and Strott agreed to wait for six (6) months before planning the surgery on the lumbar spine, noting that Strott was three months post-cervical fusion with improvement to the neck pain, but the pain in his mid-back was unchanged. Strott's CSUMF ¶ 38. At that time, the X-rays of Strott's cervical spine "showed good position of his

---

[1]     Under the Plan, a claimant is disabled when Prudential determines that: (1) you are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury; and (2) you are under the regular care of a doctor; and (3) you have a 20% or more loss in your monthly earnings due to the same sickness or injury. Regular occupation means the occupation you are routinely performing when your disability begins. Prudential will look at your occupation as it is normally performed instead of how the work tasks are performed for a specific employer or at a specific location. Defendants' SUMF ¶ 12.

screws and rods, status post his C2 to T2 decompression and fusion. His thoracolumbar spine x-rays show evidence of an upper lumbar and thoracolumbar Scheuermann's kyphosis with associated wedging of each of his verterbral bodies across that segment, as well as evidence of his previous anterior and posterior L4 to S1 fusion." *See* Defendants' Response to Strott's CSUMF ¶ 38. Strott saw Dr. Lowenstein on July 15, 2010, and reported improved preoperative neck pain and upper extremity radiculopathy. Strott complained, however, of cluster headaches as well as mid back and lower back pain and "some radiating bilateral lower extremity symptoms greater on the right than on the left side." *See* RRU 407. Dr. Lowenstein ordered a CT myelogram and an EMG. Strott's CSUMF ¶ 39.

An electrodiagnostic of Strott's bilateral lower extremities performed on July 21, 2010, was noted as "abnormal" demonstrating a "chronic well-compensated right sided L5 radiculopathic process." Strott's CSUMF ¶ 40; PRU 406. A CT myelogram was performed on July 26, 2010, and revealed "a probable nonunion/pseudoarthrosis with loosening of Hardware" at L5-S1. PRU 449. Further findings indicated: (1) endplate irregularity and wedging of L1, L2, L3, L4 and L5 . . . consistent with thoracic-lumbar Scheuermann's disease with mild kyphosis centered at L1-2." PRU 448. On August 5, 2010, Strott returned to Dr. Lowenstein with a continued complaint of mid and low back pain as well as lower extremity radiculopathy. PRU 403. Dr. Lowenstein recommended that they:

> First address [Strott's] nonunion with revision posterior instrumentation and fusion to try to treat the nonunion . . . at L5-S1. My hope would be that this would improve the low back pain as well as his lower extremity radiculopathy. After that, I think it would be reasonable to consider trying to address his kyphosis from a global standpoint or even try to address the severe degenerative changes at the apex of his kyphosis at L1-L2. However, as I had discussed with him before, my big concern would be that any type of surgery to address his global deformity would likely need to have a very significant thoracolumbar reconstruction in order to so, which would really leave him with very little spine motion, which I think would cause him significant problems overall . . .

4

*Id.*; Strott's CSUMF ¶ 42.  On September 9, 2010, Dr. Lowenstein recommended that Strott undergo a "revision posterior instrumentation and fusion for treatment on his nonunion." PRU 401.  Though Dr. Lowenstein noted "evidence of some L1-L2 severe disc degeneration, as well as some thoracolumbar kyphosis . . . likely contributing to the majority of [Strott's] mid back pain," he explained that the surgery would not be addressing those symptoms. *Id.* The lumbar spine surgery was performed on September 22, 2010. Strott's CSUMF ¶ 44.

On November 11, 2010, Strott met with Dr. Lowenstein and reported that he had some pain, including neck pain, and numbness and tingling in his hands mostly at night. Dr. Lowenstein ordered an EMG of the upper extremities but noted that the majority of mid-back pain was caused by Scheuermann's kyphosis. Strott's CSUMF ¶ 46.  An EMG of Strott's upper extremities was performed on November 17, 2010, and revealed an abnormal study which offered a clinical impression of, "cervical spondylosis with history of stenosis and myelopathic features." Strott's CSUMF ¶ 47.

In an attempt to identify the cause of  Strott's returning neck pain and numbness**,** Dr. Lowenstein ordered a CT Myelogram. Strott's CSUMF ¶ 48.  In a letter to Jerry Hood, M.D. dated January 10, 2011, requesting a preoperative evaluation, Dr. Lowenstein discussed the results of Strott's CT Myelogram noting "evidence of a likely nonunion at T1-T2 and possibly C7-T1 at the bottom of his new construct." *Id.*; PRU 1539; Dr. Lowenstein also opined that Strott "would benefit from revision of this to try to get him to heal his fusion solidly." *Id.*

In or around October of 2011, Strott was awarded Social Security Disability benefits. Strott's CSUMF ¶ 56. Strott was represented before the Social Security Administration ("SSA") by Allsup, who was hired by Prudential for such representation. PRU 363 & 364.  Pursuant to the Group Insurance Certificate, Prudential was able to offset the social security disability benefits from Strott's gross benefit payments. Strott's CSUMF ¶ 57; Defendants' Response to

Strott's CSUMF ¶ 57.  By letter dated January 5, 2012, Kenneth E. Whitney, Prudential's

Disability Claim Manager, Strott was informed that "[b]ased on the medical information in your

claim file, **LTD benefits are approved through December 31, 2014**." PRU 714-715 (Emphasis

added).  Strott's benefit was calculated to $11,721.58 per month which represented 66.6% of his

$17,582.29 monthly salary. *Id.* at 714.

     In early 2012, Strott returned to his hometown of Pittsburgh, Pennsylvania, and met with

Mark A. Fye, M.D. ("Dr. Fye") to establish surgical care, and began care with Dr. Hani Gabriel

("Dr. Gabriel"), a pain physician.  Strott's CSUMF ¶¶ 60-63.  On February 8, 2012,

approximately one (1) month after approving LTD benefits for Strott through December 31,

2014, Antoinette Rogers ("Rogers"), a Prudential claims representative, found it appropriate to

send Strott  for an independent medical evaluation ("IME"), as well as to consider a "5 day

period of direct observation"  of Strott around the IME. Strott's CSUMF ¶ 65; PRU 542.

     The IME was performed by Richard Kozakiewicz, M.D. ("Dr. Kozakiewicz") on March

21, 2012.  Strott's CSUMF ¶ 72.  Based on such examination, Dr. Kozakiewicz determined that

Strott was capable of light work on a full-time basis. *Id.*; PRU 248.  Though Dr. Kozakiewicz

reviewed formal reports of Strott's imaging studies, there is no indication he reviewed the actual

radiological films[2]. PRU 243.  Moreover, Dr. Kozakiewicz reviewed no report after July 26,

2010. *Id.* Therefore, he failed to consider the EMG of Strott's upper extremities performed on

November 17, 2010, subsequent to his September 2010 surgery, which revealed an abnormal

study and offered a clinical impression of, "cervical spondylosis with history of stenosis and

myelopathic features." Strott's CSUMF ¶ 47.  Nor did Dr. Kozakiewicz  review Strott's January

_____

[2]    Dr. Kozakiewicz acknowledges that he reviewed formal reports of the following
imaging studies: chest x-ray 2/19/10, Lumbar CT-myelogram 7/26/10, Thoracic CT-myelogram
7/26/10, and Cervical CT-myelogram, 7/26/10. PRU 243.

2011, CT Myelogram ordered to identify the cause of Strott's recurring neck pain and numbness. Strott's CSUMF ¶ 48.

Eight days after the IME, Barbara Schmidt, RN, noted on March 29, 2012, that the IME report was pending. Prudential notes indicate: "[t]he report is presently in the quality assurance stage and the rough draft of the report has been sent back to Dr. Kozakiewicz for final changes, clarification, or finalization[3]." Strott's CSUMF ¶ 78.   In April 2012, Prudential sought the opinion of Dimensional with regard to whether Strott could perform his occupation based on Dr. Kozakiewicz stated restrictions. Strott's CSUMF ¶ 81.  Dimensional responded: "[n]o, this position requires 40-60% of travel." Strott's CSUMF ¶ 82.

Because Dr. Kozakiewicz did not consider the extensive travel required by Strott's position, Prudential requested an addendum to his report. Strott's CSUMF ¶ 85.  The addendum report by Dr. Kozakiewicz dated April 25, 2012, indicated that Strott was "objectively medically capable of traveling 40%-60% of the time by plane," and that lifting twenty (20) pounds of baggage "on occasion would "certainly be objectively medically appropriate." Strott's CSUMF ¶ 86.

On May 1, 2012, Prudential reversed its own determination, made less than four months before, which approved LTD benefits through December 2014, and based solely on Dr. Kozakiewicz's report and addendum, terminated Strott's LTD benefits. Strott's CSUMF ¶¶ 90-92. The termination of benefits letter fails to discuss: (1) the abnormal EMGs; (2) Dr. Gabriel's office notes from February 2012 regarding Strott's pain and failed clinical attempts to deal with that pain; (3) the SSA's award of Social Security disability income benefits before the age of fifty (50); (4) that Dimensional refused to allow Strott to return with his undisputed impairments;

---

[3]    Neither the rough draft nor any final changes referenced by Schmidt appear in the administrative record filed by Prudential.  Strott's CSUMF ¶ 80

(5) that all Prudential's attempts at vocational rehab did not restore Strott to any level of functionality or employment; (6) Dr. Lowenstein's records that reflect the need for future midspine surgery; and (7) Strott's continued use of narcotic pain medication. Strott's CSUMF ¶ 93.

On his initial appeal of Prudential's termination of his LTD benefits, Strott's claim was referred to Vickie Kalen, M.D. to complete a file review. Strott's CSUMF ¶ 121. In direct contradiction to the findings on Strott's radiological studies submitted on appeal, as well as the findings on the EMG studies, Dr. Kalen stated:

> His imaging results show evidence of his known Scheuermann's disease an adolescent, but this loss does not translate to his complaints of pain. These imaging changes are seen in all Scheuermann's patients and do not lead to any ongoing symptomology in adulthood or neural compression. The only problem with Scheuermann's is if it causes severe kyphotic deformity. This claimant does not have this. His EMG / NCVs have not shown any active radiculopathy.

Strott's CSUMF ¶ 125; PRU 168. Notwithstanding such opinion, Dr. Kalen then concluded that Strott "retains the ability to work with the restrictions and limitations . . . which are consistent with [a] **sedentary** level with the added restrictions of no extreme neck positioning . . ." Strott's CSUMF ¶ 126; PRU 168. Such conclusion is inconsistent with Dr. Kozakiewicz's determination that Strott was capable of **light work** on a full-time basis. Dr. Kalen also comments that Strott: "is continuing to get prescriptions for erectile dysfunction medications indicating that he is capable of and does [?] perform sexual activities. If so, this is not consistent with the inability to perform work at any level." PRU 169. Dr. Kalen, however, fails to explain how Strott's ability to perform sexually is evidence that supports an ability to perform the material and substantial duties of his regular occupation.

Despite Kalen's finding that Strott was limited to function on a sedentary level, Prudential upheld its termination of Strott's LTD benefits. Strott's CSUMF ¶ 134.

Strott appealed Prudential's denial of his initial appeal with no change in the results. Prudential once again ignored the reports of Strott's many treating physicians, as well as several independent reports, ignored the SSA'a award of benefits and relied upon a review of the file by R. David Bauer, M.D. ("Dr. Bauer"). Strott's CSUMF ¶¶ 162-164. Failing to recognize that the opinions of Strott's treating physicians were based on clinical examination, radiologic evidence and a significant history with Strott, Dr. Bauer opined that the limitations and restrictions placed on Strott by his treating physicians were based "strictly on subjective pain complaints." Strott's CSUMF ¶ 166. Based upon Dr. Bauer's review, Prudential denied Strott's second appeal on August 13, 2013.

## III.    LEGAL STANDARD FOR SUMMARY JUDGMENT

Pursuant to FED. R. CIV. P 56(c), summary judgment shall be granted when there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. To support denial of summary judgment, an issue of fact in dispute must be both genuine and material, *i.e.*, one upon which a reasonable fact finder could base a verdict for the non-moving party and one which is essential to establishing the claim. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. *Id*. The court's consideration of the facts must be in the light most favorable to the party opposing summary judgment and all reasonable inferences from the facts must be drawn in favor of that party as well. *Whiteland Woods, L.P. v. Township of West Whiteland,* 193 F.3d 177, 180 (3d Cir. 1999), *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d Cir. 1987).

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P 56(e). Further, the nonmoving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir.1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The non-moving party must respond "by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the non-moving party will bear the burden of proof at trial." *Simpson v. Kay Jewelers, Div. Of Sterling, Inc.*, 142 F. 3d 639, 643 n. 3 (3d Cir. 1998), *quoting Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994).

These rules apply with equal force to cross-motions for summary judgment. *See Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008). When confronted with cross-motions for summary judgment, as in this case, the Court considers each motion separately. *See Coolspring Stone Supply, Inc. v. Am. States Life Ins. Co.*, 10 F.3d 144, 150 (3d Cir. 1993) (noting that concessions made for purposes of one party's summary judgment motion do not carry over into the court's separate consideration of opposing party's motion).

## IV. DISCUSSION

### A. Standard of Review for Action Under § 1132(a)(1)(B)

ERISA provides that a plan participant or beneficiary may bring a suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

The statute, however, does not specify a standard of review[4] for an action brought pursuant to §

1132(a)(1)(B). *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 437 (3d Cir. 1997). The Supreme

Court addressed this issue and set forth four principles to determine this standard: (1) a benefit

determination is considered to be a fiduciary act; (2) a denial of benefits is reviewed "under a *de

novo* standard"; (3) if the plan grants the administrator discretionary authority to determine

eligibility for benefits, a deferential review is appropriate; and (4) if the administrator is

operating under a conflict of interest, that conflict must be weighed as a factor in determining

whether there is an abuse of discretion. *See Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105,

111 (2008) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).

The Court of Appeals for the Third Circuit has referred to this standard of review as

"arbitrary and capricious" or "abuse of discretion." Both standards of review are essentially

identical and the Court views and will use these terms as interchangeable. *See Howley v. Mellon

Fin. Corp.*, 625 F.3d 788, 793 n. 6 (3d Cir. 2010).  Moreover, the burden of demonstrating that

the abuse-of-discretion standard applies lies with the plan administrator. *Viera v. Life Ins. Co. of

N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011).

Defendants contend that the Plan specifically grants Prudential the discretionary authority

to make factual findings, construe the terms of the plan, and determine eligibility for benefits.

_____

[4]    Plaintiff contends that the Court should apply the laws of Texas, because the insurance
policy which constitutes the Plan was issued and delivered in Texas, where Plaintiff resided
when he became disabled.  Further, the Texas Legislature has prohibited the inclusion of a
discretionary clause that grants deference to adverse claim decisions or policy interpretations by
the insurer. *See* Texas Insurance Codes 1701.062 and 1271, effective on June 17, 2011, 28 Tex.
Admin. Code §§ 3.1202, 3.1203. Defendants urge this Court to apply the law of the State of
Delaware because the Group Contract contains a contractual choice of law provision stating
"[t]he Group Contract is delivered in and is governed by the laws of the Governing Jurisdiction"
and the "Governing Jurisdiction: State of Delaware." PRU 1-2. In determining the standard of
review to be applied for an action brought pursuant to § 1132(a)(1)(B), this Court follows the
precedent of the United States Supreme Court and the federal courts of this Circuit.

Dimensional maintains a Wrap-Around Summary Plan Description ("Wrap SPD") PRU 81-134, and, Defendants argue, the Wrap SPD together with the separate benefits booklets prepared for participating employees of Dimensional constitute the Summary Plan Description for Dimensional's Welfare Benefit Plan. Defendants' SUMF ¶ 5. The Wrap SPD provides:

> Dimensional also hereby appoints each group insurance policy issuer (Issuer) listed in the Plan Information section of this document, as a named fiduciary with such powers as may be necessary to determine the benefits payable under the respective insurance policies and resolve all questions pertaining to the applicability of the benefit provisions of said policies on behalf of the Plan.

> Dimensional hereby intends that each Issuer shall be deemed to have complied with the requirements of ERISA §503 (claims procedure) in its exercise of its authority unless it has abused its discretion hereunder by acting arbitrarily and capriciously.

*Id.*; PRU 85. The Wrap SPD further provides:

> You may appeal any denial of benefits to the insurance carrier/claims administrator. The insurance carrier/claims administrator is the sole fiduciary of the Plan, and exercises all discretionary authority and control over the administration of the Plan and has sole discretionary authority to determine eligibility for Plan benefits and to construe the terms of the Plan.

*Id.*; PRU 92. Prudential is identified as the "Group Insurance Policy Issuer (Insurance Carrier)/Third Party Administrator" for "Life, AD&D, and Disability" benefits. PRU 84.

Dimensional also provided Prudential with the "Summary Plan Description" ("the "SPD") PRU 73-78, which was attached to the Group Insurance Certificate. PRU 73. The SPD states that Prudential, as Claims Administrator, has "the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits. The decision of the Claims Administrator shall not be overturned unless arbitrary and capricious." Defendants' SUMF ¶¶ 6 & 7; PRU 75.

In *CIGNA Corp. v. Amara*, 563 U.S.    , 131 S. Ct. 1866, 179 L. Ed. 2d 843 (2011), the United States Supreme Court addressed the weight to be afforded to SPDs in evaluating claims

under ERISA § 502(a)(1)(B).  In *Amara*, the Court found it improper under Section 502(a)(1)(B) to enforce the terms of the SPD over the plan language reasoning that the syntax of another section of ERISA, § 102(a), which obliges plan administrators to furnish SPDs and requires that participants and beneficiaries "be advised of their rights and obligations 'under the plan,'" suggests that the information about the Plan provided by SPDs "is not itself part of the plan." *CIGNA Corp. v. Amara*, 131 S. Ct. at 1877. Moreover, the Court specifically concluded that "the summary documents, important as they are, provide communication with beneficiaries about the plan, but that their statements do not themselves constitute the terms of the plan for purposes of § 502(a)(1)(B)." *Id.* at 1778

Since *Amara*, courts have agreed that summary plan provisions, including stipulations not present in the plan certificate, are unenforceable. *See, e.g., Conn. Gen. Life Ins. v. Roseland Ambulatory Ctr. LLC*, 2013 U.S. Dist. LEXIS 136374  (D.N.J. Sept. 24, 2013) (finding that the terms of the SPD are not legally binding when the SPD conflicts or creates terms not present in the governing benefits plan); *Baker v. Pa. Econ. League, Inc. Ret. Income Plan*, 811 F. Supp. 2d 1136, 1142 (E.D. Pa. 2011) (provision added to retirement plan, which was never formally added as an amendment to the plan, was not considered by the court under a claim of denial of benefits because it was not a term of the Plan); *Kaufmann v. Prudential Ins. Co. of Am.*, 840 F. Supp. 2d 495, 499 (D. N.H. 2012) (concluding that a summary plan document cannot establish appeal procedures that are not contained within the plan document); *Merigan v. Liberty Life Assurance Co. of Boston*, 826 F. Supp. 2d 388, 396-97 (D. Mass. 2011) (holding an appeal deadline set forth in the summary plan document to be unenforceable).

In deciding that a *de novo* standard was appropriate in reviewing a life insurance claim, a district court in Virginia recently concluded that language in a summary document granting sole interpretive power of a policy's terms to an insurance company was due no deference. *Shoop v.*

13

*Life Ins. Co. of N. Am.*, 839 F. Supp. 2d 830, 837 (E.D. Va. 2011). The court reasoned that while information in the summary document could not be used to determine the standard of review, the language from summary documents could be used during a *de novo* review to help define any ambiguous language contained within the plan. *Id.*

Courts have given deference to summary plan provisions, however, when such provisions are either labeled by the plan administrator as legally enforceable or are referred to in the plan certificate. *See, e.g., Frey v. Herr Foods Inc. Employee Welfare Plan*, 2012 U.S. Dist. LEXIS 176505 at *9-10 (E.D. Pa. Dec. 13, 2012) (terms in summary document generally unenforceable and could only be given deference when provisions are specifically identified as legally binding or are incorporated into the plan); *Bd. of Trustees of the Nat. Elevator Indus. Health Benefit Plan v. McLaughlin*, 2014 U.S. App. LEXIS 18756, at *2-3, n.1 (3d Cir. Oct. 1, 2014) (non-precedential) (permitting substitution of terms of SPD for terms of benefits plan because parties had consistently done so, but acknowledging that terms of SPD are generally unenforceable) (citing *US Airways, Inc. v. McCutchen*, 133 S.Ct. 1537, 1543 n.1 (2013) ("Because everyone in this case has treated the language from the summary description as though it came from the plan, we do so as well.")); *Langlois v. Metro. Life Ins. Co.*, 833 F. Supp. 2d 1182, 1185-1186 (N.D. Cal. 2011) (holding that a provision in a SPD stating that all of its terms are to be "legally enforceable" should be considered enforceable elements of a plan, provided that the summary terms do not conflict with the plan terms); *Tetreault v. Reliance Standard Life Ins. Co.*, 2011 U.S. Dist. LEXIS 152252, at *23 (D. Mass. Nov. 28, 2011) (concluding that if the SPD is expressly labeled as being part of the formal plan document, claims procedures in the document are part of the plan itself).

The Court of Appeals for the Third Circuit  has found that "[t]o be insulated from *de novo* review, a plan must communicate the idea that the administrator not only has broad-ranging

14

authority to assess compliance with pre-existing criteria, but also has the power to interpret the rules, to implement the rules, and even to change them entirely." *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d at 417 (quoting *Diaz v. Prudential Ins. Co. of Am.*, 424 F.3d 635, 639 (7th Cir. 2005)). Finding no "magic words" that would prompt an abuse-of-discretion review, the *Viera* court suggested that administrators adopt the following language: "[b]enefits under this plan will be paid only if the plan administrator decides in [its] discretion that the applicant is entitled to them." *Id.*

The Wrap SPD appoints Prudential as "named fiduciary with such powers as may be necessary to determine the [Life, AD&D, and Disability] benefits payable . . . and [to] resolve all questions pertaining to the applicability of the [Life, AD&D, and Disability] benefit provisions . . . on behalf of the Plan." PRU 85. The Wrap SPD specifically gives Prudential as claim administrator "all discretionary authority and control over the administration of the Plan and has sole discretionary authority to determine eligibility for Plan benefits and to construe the terms of the Plan." PRU 92. Such language communicates Prudential's "broad-ranging authority" under the Plan as required by *Viera*, *supra.*, to "prompt an abuse-of-discretion review."

Similarly, the SPD grants Prudential "the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits." PRU 75. Therefore, SPD in this instance neither conflicts nor creates terms not present in the governing Wrap SPD. Accordingly, this Court shall apply the arbitrary and capricious/abuse of discretion standard, while weighing Prudential's conflict of interest[5], as it both evaluates claims for benefits

---

[5] There are two types of conflicts that an ERISA fiduciary may face: structural and procedural. *Sivalingam v. Unum Provident Corp.,* 735 F. Supp. 2d 189, 195 (E.D. Pa. 2010). "Structural conflicts" relate to financial incentives inherent in a plan's design, such as where the same entity both funds and administers a benefits plan. See *Post v. Hartford Ins. Co.*, 501 F.3d 154, 162 (3d Cir. 2007); *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. at 112.

and funds the benefits, in determining whether there was an abuse of discretion. *See Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. at 106; *Estate of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 525 (3d Cir. 2009).

      B.      <u>Prudential's Denial of Benefits Arbitrary and Capricious</u>

            1.      <u>Termination of LTD Benefits</u>

Under the arbitrary and capricious standard, an administrator's decision will only be overturned if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law. . . . the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." *Pinto v. Reliance Std. Life Ins. Co.*, 214 F.3d 377, 387 (3d Cir. N.J. 2000). The Court's first concern is Prudential's abrupt reversal of its decision dated January 5, 2012, to approve LTD benefits for Strott through December 31, 2014. An administrator's reversal of its decision to award a claimant benefits without receiving any new medical information to support this change in position is an irregularity that counsels towards finding an abuse of discretion. *See Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 848 (3d Cir. 2011); *Post v. Hartford Ins. Co.*, 501 F.3d 154, 164-165 (3d Cir. 2007).

Not thirty-five (35) days after its decision, Prudential ordered an IME, and considered a five (5) day observation of Strott's activities. The IME was performed by Dr. Kozakiewicz, on March 21, 2012. As noted above, Dr. Kozakiewicz determined that Strott was capable of light work on a full-time basis, however, he failed to indicate whether Strott was able to perform the material and substantial duties his regular occupation. Dr. Kozakiewicz noted Strott's "work duties were administrative" which required "flying throughout the country," and he recognized that Strott would have trouble with the weight of luggage, given the recognized 20 pound limit on lifting. PRU 244.

Dr. Kozakiewicz reviewed formal reports of certain of Strott's imaging studies, but there is no indication he reviewed the actual radiological films, nor is there any indication that Kozakiewicz reviewed a report of an image study after July 26, 2010. Therefore, he failed to consider the EMG of Strott's upper extremities performed on November 17, 2010, subsequent to his September 2010 surgery, which revealed an abnormal study and offered a clinical impression of, "cervical spondylosis with history of stenosis and myelopathic features." Nor did Dr. Kozakiewicz review Strott's January 2011, CT Myelogram ordered to identify the cause of Strott's recurring neck pain and numbness. It appears, in fact, that Kozakiewicz did not have the same complete record that Prudential reviewed prior to approving Strott's LTD benefits in January of 2012.

Significantly, Dr. Kozakiewicz failed to recognize Strott's underlying diagnosis of Scheuermann's disease and the pain resulting therefrom, and was not provided with information regarding Strott's Social Security award. Despite an incomplete record, and based on a single examination, Dr. Kozakiewicz restricted Strott to sitting between four (4) and five (5) hours, standing between two (2) and three (3) hours and walking one (1) hour in an 8 hour day. PRU 248. Dr. Kozakiewicz failed to opine how such restrictions would allow Strott to perform the material and substantial duties his regular occupation which required him travel 40-60% of the time.

Appearing to recognize the inadequacy of Kozakiewicz's report, in April 2012, Prudential sought the opinion of Dimensional with regard to whether Strott could perform his occupation based on the stated restrictions. Dimensional responded: **"[n]o, this position requires 40-60% of travel**." Strott's CSUMF ¶¶ 81 & 82 (Emphasis added). Prudential requested an addendum from Dr. Kozakiewicz to address the travel issue, and without an objective discussion regarding Strott's limitations, Kozakiewicz concluded that Strott was

"objectively medically capable of traveling 40%-60% of the time by plane," and that lifting twenty (20) pounds of baggage "on occasion would "certainly be objectively medically appropriate." Strott's CSUMF ¶ 86.

Inconceivably, Prudential reversed its own determination made less than four months before, and based solely on Dr. Kozakiewicz's flawed IME, as well as a clearly inadequate report[6] and addendum, terminated Strott's LTD benefits. This Court is unable to give Kozakiewicz's report and addendum, as well as Prudential's reliance thereon, any credence when viewed against the substantial evidence of Strott's treating physicians. Moreover, Prudential did not call into question the reports and records of Strott's treating physicians. Indeed, if Prudential had reason to question the scientific basis of those reports, it was Prudentials burden to support its basis of contention. *Lasser v. Reliance Standard Life Ins. Co.,* 344 F.3d 381, 391 (3d Cir. 2003). It failed to do so. The Court finds, therefore, that Prudential's reversal of its own decision and its initial termination of Strott's LTD benefits based solely on Dr. Kozakiewicz's flawed IME and report, was without reason, unsupported by substantial evidence and erroneous as a matter of law.

### 2. Appeals of Prudential's Termination of LTD Benefits

Similarly, the Court finds Prudential's denial of Strott's appeals to be unsupported by the substantial evidence provided. After his appeal, Prudential referred Strott's claim to Dr. Kalen for review. In direct contradiction to the findings on Strott's radiological studies submitted on appeal, as well as the findings on the EMG studies, Dr. Kalen stated:

---

[6] Additionally, Kozakiewicz referenced his own "2 lumbar surgeries" that he contended "added a personal perspective to [his] professional medical practice." PRU 247. The relevance of such statement in a report concerning Strott's ability to perform his occupation, however, escapes the Court.

His imaging results show evidence of his known Scheuermann's disease as adolescent, but this loss does not translate to his complaints of pain. These imaging changes are seen in all Scheuermann's patients and do not lead to any ongoing symptomology in adulthood or neural compression. The only problem with Scheuermann's is if it causes severe kyphotic deformity. This claimant does not have this. His EMG / NCVs have not shown any active radiculopathy.

Strott's CSUMF ¶ 125; PRU 168.   Kalen further noted:

Based on the documentation reviewed, Mr. Strott does have medically necessary restrictions and limitations from May 1, 2012, forward. The claimant is status post-fusion from C2-T2 and a lumbar fusion from L4-S1. These fusions would automatically prevent the claimant from activities that require a lot of postural activities or lifting more than 20 lbs. occasionally. The claimant has an almost completely fused cervical spine and a 3 level lumbar fusion. These are all confirmed in the records as surgery that has been performed. In any patients with such multi-level cervical fusion, there should be no activities that involve overhead work[7] and the neck would need to remain in a neutral position. The claimant should not lift more than 10 lbs. frequently, 20 lbs. occasionally, could only bend occasionally; could not climb ladders or scaffolds. There would be no restrictions on sitting, other than allowing change of position every 1 hour. There would be no restrictions on upper extremity handling or fingering. The claimant could occasionally squat, kneel or crawl. The duration of these restrictions and limitations would be permanent due to permanent C2-T2 fusions and L4-S1 fusions.

Strott's CSUMF ¶ 122; PRU 167-168.  Dr. Kalen then concluded that Strott "retains the ability to work with the restrictions and limitations . . . which are consistent with [a] sedentary level with the added restrictions of no extreme neck positioning . . ." Strott's CSUMF ¶ 126; PRU 168. Such conclusion is inconsistent with Dr. Kozakiewicz's determination that Strott was capable of light work on a full-time basis. Moreover, it fails to prove in any way that Strott was capable of performing the material and substantial duties his regular occupation, which Defendants agree consisted of light duties.

Dr. Kalen also commented that Strott : "is continuing to get prescriptions for erectile dysfunction medications indicating that he is capable of and does  perform sexual activities. If

---

[7]    But stowing carry-on luggage in an airplane's overhead hold is not a problem!

so, this is not consistent with the inability to perform work at any level." PRU 169. Dr. Kalen, however, fails to explain how Strott's ability to perform sexually is evidence that supports an ability to perform the material and substantial duties of his regular occupation. Dr. Kalen also specifically disagreed with the Social Security Administrations finding that Strott was disabled from all work, and therefore gave such determination no weight. PRU 169.

Prudential also referred Strott's file to Fran Grunden ("Grunden"), a Vocational Consultant. Strott's CSUMF ¶ 131. It appears that Grunden was provided, and she reviewed, *inter alia*, Dr. Kalen's Peer Review and the Vocational Report from Pinti Rehabilitation Management. PRU 144. There is no evidence, however, that Grunden was provided with, or in fact reviewed, any of the reports or opinions of Strott's treating physicians. Nor did Grunden review the decision of the SSA which found Strott incapable of performing any occupation. Based upon Dr. Kalen's Peer Review regarding Strott's limitations, Grunden opined: "[the] [p]hysical demands of [Strott's] occupation appear to be within [Strott's] capacity. PRU 149.

In support of his appeal, Strott submitted: (1) the sworn statement and medical records of Dr. Gabriel, his pain physician; (2) medical records and report from Dr. Jerry Hood, his primary care physician in Texas; (3) medical records and report of Dr. William Coyle ("Dr. Coyle"), his primary care physician in Pittsburgh; (4) medical records and report of Dr. Lowenstein, his spinal surgeon; (5) recent CT scans; (6) photographs; (7) three radiology images; and (8) a vocational report by Mark Pinti ("Pinti"). PRU 770-1723. Each of Strott's medical providers also submitted a response, as well as their findings and opinions, with regard to Dr. Kozakiewicz's IME report and addendum. Strott's CSUMF ¶ 96.

With regard to Dr. Kozakiewicz's report, Dr. Gabriel made the following observations:

(1)     Kozakiewicz's assertion that the treatment that Strott was receiving was "unnecessary" revealed a lack of understanding of the purpose of the pain management. Kozakiewicz's knowledge of occipital neuralgia, the awareness of

medial nerve injection, his knowledge about radiofrequency ablation and his knowledge about Prialt was questioned;

(2)   Kozakiewicz's reference to his lumbar back surgeries in comparison to Strott's extensive surgeries in the lumbar and cervical spine was completely inappropriate;

(3)   Kozakiewicz's functional evaluation was inconsistent with his evaluation of Strott's pain; and

(4)   Even if Strott could be performed the demands of his occupation within the range of physical demand described by Dr. Kozakiewicz, at a minimum, "he is going to miss seven to eight working days, if he continues working according to that schedule" and he will be in constant pain.

Strott's CSUMF ¶¶ 98, 99, 100 &103.  Strott's primary care physicians from Texas and

Pittsburgh opined as follows:

(1)   Dr. Hood asserted that Dr. Kozakiewicz's report failed to identify Strott's underlying chronic disease etiology or mention anywhere the fact that Strott has had multiple surgeries secondary to his diagnosis of Scheuermann's disease, which generate a tremendous amount of ongoing and continual pain;

(2)   Dr. Hood disagreed with Kozakiewicz's assessment of Strott's physical capabilities, noting that Strott would not have the capability to sit continuously for 4-5 hours a day or stand for 2-3 hours a day. Because of his Scheuermann's disease, Strott would not be capable of sitting more than 2 hours in an 8 hour day even with normal breaks. With regard to his capabilities for lifting and carrying, I recommend that he never lift more than 10 pounds on an occasional basis. Standing and walking are also affected. Mr. Strott does not have the capability to engage in any prolonged continuous postural activities;

(3)   Dr. Coyle expressed concerns about Dr. Kozakiewicz's opinion due to his failure to recognize Strott's diagnosis and treatment of his condition stating "I find it quite disturbing that Dr. Kozakiewicz's report makes no mention of the primary condition which has led to [Strott's] Doug's disability, *i.e.*, juvenile osteochondrosis of the spine;

(4)   Dr. Coyle agreed that the pain regimen was ineffective because the pain went beyond the use of oral medications thus requiring the transition to insertion of an intrathecal morphine pump. Dr. Coyle opined that the patient would not undergo nor would any competent pain management specialist recommend nor would any competent neurosurgeon perform the insertion of an intrathecal device for pain control unless the patient's pain was of significant severity.

Strott's CSUMF ¶¶ 105-107.

Dr. Lowenstein, who disagreed with both Dr. Kozakiewicz's assessment of functionality as well as Strott's ability to travel, performed a comprehensive physical examination of Strott on August 2, 2012, and stated in an "Assessment and Plan" as follows:

[Strott] is a 47-year-old gentleman who is status post multiple cervical and lumbar surgeries for treatment of C-arthroses and recurrent spinal stenosis whose really main complaint at this time is thoracolumbar kyphosis and mid-back pain. . . In terms of the degenerative changes seen, he does have some wedging of those vertebral bodies and that may continue to remodel and worsen over time. Certainly, if it did that would be an indication to consider further treatment options. [Strott's] problem is he really has these erosive degenerative changes throughout his thoracic and lumbar spine and it would be very difficult to decide where to start and stop a revision surgery. His discs at L3-4 and L2-3 certainly look somewhat better than his remaining lower thoracic and upper lumbar levels and I certainly think you could contemplate doing a short-level fusion such as from T9 to L2 to try to address some of his thoracolumbar kyphosis. However, there is a real risk of adjacent segment degeneration above or below, particularly below at his remaining two motion segments at L2-3 and L3-4 and that certainly could result in possible worsening symptoms and need for revision surgery. [He] already has a fusion from C2 to T1 and any extension proximally of his lumbar fusion to his mid-thoracic fusion would greatly impair his remaining motion. [Strott]is a very young guy at 47 years old who still really hopes to remain as athletically active as he could. To truly address his kyphosis and degeneration, you could extend his fusion from his lumbar spine up to his upper thoracic spine; however, that would leave him with very little motion at all and I think his upper cervical levels would then wear out even faster, potentially resulting in need for further fusion and that would significantly restrict his range of motion and . . . not improve his overall quality of life. In terms of his MRIs while his disc degeneration is very significant, particularly at L1-2 and at T11-12 as well as the wedging at T9-T10 and T11 of the vertebral bodies, he does not have any frank spinal cord compression throughout which is wonderful . . . [A]t the point which he cannot adequately control his symptoms with pain management we may have to consider other surgical treatment options but I certainly would hope to avoid that . . . unless he starts to develop neurological symptoms which would then need to be readdressed. He is currently seeing Mark Fye in Pittsburgh from a surgical standpoint and he is seeing Hani Gabriel from a pain management standpoint in Pittsburgh. I discussed with Doug that I would be happy to see him at any point in the future and certainly if he is contemplating surgery I would be happy to discuss it with him . . . However, again I certainly feel that if he can control his symptoms with conservative management strategies including physical therapy and pain management . . . that would ultimately be best as any further surgery would greatly restrict his motion which . . . would potentially decrease his overall quality of life, though at some point symptoms may warrant possible revision surgical procedures.

22

Strott's CSUMF ¶¶ 109-111; PRU 1607. Moreover, in a letter dated 10/16/2012, Dr. Lowenstein

specifically addressed Strott's ability to perform the activities required by his occupation:

> [Strott] has fairly significantly restricted cervical range of motion due to . . .
> multilevel cervical fusion . . . to address his recurrent cervical stenosis and
> pseudarthroses. [He] continues to have fairly significant pain [which]
> dramatically inhibits his ability to perform his activities of daily living. His
> previous job activities required . . .a fairly extensive amount of traveling and . .
> .[Strott] is significantly limited in terms of his ability to do these types of
> activities secondary to his chronic pain. He has tried multiple different types of
> oral analgesics and even has tried an intrathecal pain pump as well as stimulator
> trials, none of . . . fully [controls] his pain. . . I really do not think [Strott] is able
> to do the frequent travel which was required from his previous job, and . . . the
> seated position clearly causes the most pain for him, as it really does put the most
> strain on his thoracolumbar junction [which] creates an intolerable level of pain . .
> .

PRU 1616.

Strott also submitted diagnostic imaging to Prudential. A whole body bone scan

performed at Canonsburg General Hospital on June 14, 2012, revealed, a possible healing

compression fracture at the "T9 or T10 level," as well as degenerative changes within the lumbar

spine. PRU 873. An MRI of the thoracic spine was also performed that day. The resulting

report noted that a, "limited examination of the thoracic spine as described above due to metallic

artifact involving the superior and inferior aspects" was completed and showed, " moderate

degenerative disc disease seen throughout the thoracic spine; no evidence for acute compression

fracture; and mild diffuse disc bulging at multiple levels without evidence for disc protrusions or

herniations." Strott's CSUMF ¶ 113.

MRIs of both the thoracic spine and the cervical spine were performed on Strott at

Canonsburg General Hospital on October 12, 2012. The thoracic spine MRI revealed: (1)

Thoracic straightening with mild increased kyphosis at T10-T11 and degenerative compression

of the T7- T12 vertebral bodies, most prominent at T10-T11, grossly stable since 6/14/2012. No

definite acute fracture or subluxation identified; (2) small posterior catheter in the central canal

terminates at the level of T10-T11 on the right appearing intrathecal from the level of the T11-T12 disc space; (3) mild central canal stenosis at T10-T11 and possibly T9-T10 with possible associated cord compression; and (4) prominent multilevel neural foraminal stenosis appears severe bilaterally from T3-T4 through T6-T7, bilaterally at T9-T10, probably bilaterally at T1-T2, and on the left T7-T8. Strott's CSUMF ¶ 114.

The MRI of Strott's cervical spine revealed: (1) status post anterior discectomy and fusion with plate and screws from C3 to C6, posterior decompression from C3 through C6 with posterior fusion from C2 through T2. Hardware grossly intact, within the limits of this study. Cervical straightening; 2) no acute fracture or subluxation; 3) neural foraminal stenosis throughout the visualized spine, as described above, most prominent, severe bilaterally, at T1-T2. In the cervical spine, most prominent, moderate to severe bilaterally, at C3-C4; and 4) mild central canal stenosis with suspected mild cord compression at C6-C7 secondary to a disc osteophyte complex. Strott's CSUMF ¶ 115.

Mark A. Pinti ("Pinti"), a vocational expert ("VE"), reviewed all of Strott's treating physician reports, as well as Dr. Kozakiewicz's IME report. PRU 1714. After a comprehensive evaluation of Strott's position of Regional Director of Financial Advisor Services with Dimensional, Pinti opined that "Strott performed a job at a higher level of expertise than most people experience. [Strott] is required to make highly informed decisions and perform sophisticated activities on a daily basis. . . The job requires [Strott] to be 'at the top of his game' all of the time. When an individual has constant debilitating pain, the potential for error is large." PRU1715-1716, PRU 1719.

Finding that Strott was not capable of performing the duties and functions of his occupation as Dimensional's Regional Director of Financial Advisor Services, Pinti stated:

. . . Strott is not capable of sustained remunerative work activity at any level of exertion. Dr. Gabriel, Dr. Coyle, Dr. Hood, and Dr. Lowenstein have all found that Mr. Strott is no longer capable of performing even the most basic duties of any job let alone the highly complicated and stressful job of Regional Director of Financial Advisor services. He would be unable to sit, stand, walk, lift/carry, concentrate or pay attention at even a sedentary unskilled level. He certainly cannot travel, which is required 40%-60% of the time.

PRU 1720.

By letter dated January 7, 2013, Prudential denied Strott's appeal and upheld its termination of Strott's LTD benefits. Prudential elevated a non-examining physician's opinion above that of the treating physicians stating: "[a]ccording to the medical assessment, the restrictions and limitations imposed by Mr. Strott's treatment providers are not supported, consistent with or proportionate to the documentation provided for review." PRU 687. Prudential also gave more weight to Grunden's evaluation, which ignored all the reports and records of Strott's treating physicians, than the reasoned, comprehensive evaluation prepared by Pinti. Further, Prudential disregarded the findings of the SSA, a review initiated by Prudential, stating:

While Social Security considers Mr. Strott disabled by **their rules**, information in our file does not support **disability as defined by Prudential's Group Insurance policy**, which is defined above. Please keep in mind that not all disability programs or definitions are alike. **A finding by a Governmental Agency such as Social Security that a person is disabled does not necessarily mean they qualify under the terms of their Group Insurance policy.** Just as the Government must follow the provisions of the law in making their determination, we must follow the terms of the Group Insurance policy. **Additionally, in reviewing Mr. Strott's LTD claim we had an IME and a physician review to assist with the determinations made on his claim. It does not appear that the Social Security Administration had the benefit of these reviews in rending their decision**.

PRU 687 (Emphasis Added).

As an initial matter, this Court finds such statement by Prudential to be blatantly disingenuous. The analysis by the SSA is an "any occupation" analysis as opposed to

Prudential's "own occupation" analysis. The SSA found, based upon the reports of Strott's actual treating physicians, that Strott could not perform work of any kind. Prudential, however, completely disregards the relevance of the SSA's determination because the SSA did not have "the benefit of" a flawed IME and a medical assessment based upon a paper review by a non-treating physician.

Additionally, this Court finds the noted deficiencies of Kalen's report made by Strott's treating physicians to be particularly telling. Dr. Coyle, for example, noted:

> Dr. Kalen is a pediatric orthopedic spinal surgeon and therefore does not treat adult patients who develop chronic disability problems. . . I believe that there is a lack of understanding on her part that Mr. Strott's work involves a good deal of travel which means getting on and off planes, going through crowded busy airports, attempting to either lift baggage or pull a roller board through these areas. I believe that a physician, first and foremost, needs to examine the patient in order to determine whether or not they are capable of performing on the job. In that, I have done so, I realize looking at Mr. Strott's posture and the way he moves in small spaces such as an examine room, which is considerably larger than the inside of a plane, that a man of his size and level of pain and discomfort, might well have to be escorted off a plane by an air marshal because he would not be able to tolerate the duration of the flight.

PRU 1858. Robin E. Osborn, D.O. ("Dr. Osborn"), a neuroradiologist, performed an independent examination of Strott's actual imaging studies including CT scans done on October 10, 2012, and also reviewed Dr. Kalen's report. With regard to Kalen's report, Dr. Osborn stated:

> At the outset, let me state that I believe that Dr. Kalen did not see the images of Mr. Strott's back. I know it says in her report that she looked at a copy of images, but I do not see where she actually examined the physical images generated by the studies done in 2012. Therefore, I would consider myself to be a more appropriate resource for what is actually depicted in Mr. Strott's spine. Additionally, at the outset, it is worth noting, that I disagree with Dr. Kalen's assessment regarding Scheuermann's disease. It seems as if Dr. Kalen has reformatted the issue in this case and has unnecessarily objected to Scheuermann's kyphosis in a general way without paying attention to the specific problems that are generating pain and discomfort in Mr. Strott's case.
>
> I disagree completely with [Dr. Kalen's] statement that, "Scheuermann's disease is a growth disturbance of the vertebral endplates ending at adolescence and is not a functionally impairing condition." That statement is too general. Scheuermann's

kyphosis can generate a tremendous abnormality in the spine which creates "pain generators" for the effected individual. . . [T]he actual radiology studies performed by Canonsburg Hospital, reflect a serious level of pathology and several pain generators including wedging, disc compression and degeneration are clear and obvious.

I wholeheartedly disagree with the conclusion offered by Dr. Kalen and I again believe that she did not examine the images of Mr. Strott's spine. Her statement that,

> "Again, no objective evidence in the record supports the severity of his ongoing complaints and self reported functional impairment. All is subjective. His underlying Scheuermann's would not cause the pain and allegations of neurologic findings of numbness, tingling and weakness that he reports. . ."

does not have a basis in reality. Mr. Strott's condition as it is objectively depicted in the actual study clearly manifests a number of problems caused by Scheuermann's disease that are significant generators of pain and discomfort. . . The only way [Dr. Kalen's report] can be supported is with a simplistic impression of what Scheuermann's disease is and how it "typically" evolves in a person's teens versus what the possibilities really are in a severe case of Painful Juvenile Kyphoscoliosis (Scheuermann's) and what adult ramifications can be. We see those ramifications well on Mr. Strott's imaging and his own care providers documented these effects on him throughout their reports.

PRU 1914-1915. Finally, Dr. Osborn opined: "Mr. Strott suffers from significant pain generators and that his spinal pathology would be rated as severe following the onset of Scheuermann's disease in the distant past. I do not have any doubt that this young man experiences pain and difficulty secondary to the multiple degenerative conditions and spondylosis initiated by Scheuermann's kyphosis several years ago." PRU 1915.

This Court gives little weight to either Dr. Kalen or Prudential's Vocational Consultant Fran Grunden. Dr. Kalen either failed to read, or did not correctly read, Strott's actual imaging studies. She disregarded the opinions of Strott's treating physicians and surgeons and put more emphasis on Strott's ability to perform sexually, than his ability to perform the material and substantial duties his regular occupation. Grunden was not even provided with the reports of

Strott's treating physicians. The Court also sees no need to comprehensively analyze the report of Dr. Bauer[8] regarding Strott's second appeal, as it appears to be more of the same.

The Court finds, therefore, that Prudential's reliance upon Dr. Kalen, Dr. Bauer and Fran Grunden to uphold termination of Strott's LTD benefits to the exclusion of the substantial evidence provide by the many treating and physicians, as well as the decision of the SSA, was arbitrary and capricious and erroneous as a matter of law.

### 3. Prudential's Failure to Evaluate Strott's Occupation

The Third Circuit has found that "it is essential that any rational decision to terminate disability benefits under an own-occupation plan consider whether the claimant can actually perform the specific job requirements of a position." *See Heim v. Life Ins. Co. of N. Am.*, 2012 U.S. Dist. LEXIS 38257, at *33 (E.D. Pa. Mar. 21, 2012) (quoting *Miller v. Am. Airlines, Inc.*, 632 F.3d at 855. Here, Prudential failed to give a reasoned evaluation of Strott's ability to perform the material and substantial duties of his regular occupation.

Strott was Dimensional's Regional Director, a position described by Dimensional as follows:

> The Regional Director will play the role of Business Development – Bank Channel, and will be focused on developing relationships with both Executives and Financial Advisors within Banks and Credit Unions. The role helps develop the business, manage the communications at the Executive and advisor level, and is responsible for the asset growth of the business. The role is also responsible for the relationship management and development with existing and new prospective Bank TAMP clients (i.e. OBS).

Strott's CSUMF ¶ 36. The most comprehensive evaluation of Strott's occupation was done by Mark A. Pinti. *See* PRU 1714-1720. Prudential's reviewers paid little attention to Pinti's

---

[8] Dr. Bauer's conclusion that the findings on imaging studies did not correlate with Strott's ongoing complaints of pain is contradicted by the actual imaging studies. *See* Dr. Osborn's Report at PRU 1913-1916.

evaluation, however, and merely found Strott capable of performing the duties of his occupation without a proper objective analysis.

### 4.    Prudential Ignored the SSA's Award of Disability Benefits

District Courts in this Circuit have opined that "an ERISA plan administrator's failure to address the Social Security Administration's finding that the claimant was 'totally disabled' is yet another factor to consider in assessing the record." *Moros v. Conn. Gen. Life Ins. Co.*, 2014 U.S. Dist. LEXIS 10696, 47-48 (E.D. Pa. Jan. 28, 2014) (citing *Dorsey v. Provident Life & Accident Ins. Co.*, 167 F. Supp. 2d 846, 856 n. 11 (E.D. Pa. 2001)). As this Court stated above, Prudential disregarded the relevance of the SSA's determination that Strott was totally disabled. Moreover, Prudential ignored the fact that, in its determination, the SSA applied a much more stringent standard. Though the SSA's determination is not dispositive, Prudential's characterization of the SSA's analysis calls into question the credibility and legitimacy of Prudential's ultimate decision.

In *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008), the Supreme Court commented on a situation with a similar conflict as follows:

> [T]he [Court of Appeals] found questionable the fact that MetLife had encouraged Glenn to argue to the Social Security Administration that she could do no work, received the bulk of the benefits of her success in doing so (the remainder going to the lawyers it recommended), and then ignored the agency's finding in concluding that Glenn could in fact do sedentary work. . . This course of events was not only an important factor in its own right (because it suggested procedural unreasonableness), but also would have justified the court in giving more weight to the conflict (because MetLife's seemingly inconsistent positions were both financially advantageous).

*Id.* at 119. Here, Prudential assisted Strott in applying for Social Security disability benefits, thus conceded his inability to "engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Prudential, obviously, received a substantial

financial benefit from the SSA's determination, yet failed to give any weight to the SSA's award and ignored the medical basis for such award while terminating Strott's LTD benefits.

Though not dispositive, Prudential's "seemingly inconsistent positions" suggest a procedural unreasonableness, and is an important factor in this Court's determination that Prudential abused its discretion in terminating Strott's LTD benefits.

       5.    <u>Remedy</u>

The Third Circuit has directed that when a Court has found that a Plan has abused its discretion in terminating benefits, "retroactive reinstatement of a claimant's benefits is the proper remedy when the administrator's termination decision was unreasonable." *Miller v. Am. Airlines, Inc.*, 632 F.3d at 856-857; *Molinaro v. UPS Health & Welfare Package*, 918 F. Supp. 2d 291, 300 (D. N.J. 2013); *See also Pannebecker v. Liberty Life Assur. Co. of Boston*, 542 F.3d 1213, 1221 (9th Cir. 2008); *Schneider v. Sentry Group Long Term Disability Plan*, 422 F.3d 621, 629 (7th Cir. 2005); *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 776 (7th Cir. 2003); *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 599 (6th Cir. 2001); *Harrison v. Prudential Ins. Co. of Am.*, 543 F. Supp. 2d 411, 424 (E.D. Pa. 2008). Strott, in this instance, shall be awarded the LTD benefits he would have been entitled to had his benefits not been terminated.

In *Fotta v. Trustees of the UMWA Health & Retirement Fund of 1974*, 165 F.3d 209, (3d Cir. 1998), our Court of Appeals "ma[d]e explicit that interest is presumptively appropriate when ERISA benefits have been delayed." *Id.* at 214; *see also id.* at 215 (Alito, J., concurring) ("[s]uch an award is recognized as appropriate equitable relief in comparable circumstances under the law of trusts"). Strott, therefore, is entitled to interest on his reinstated benefits. In the instant case, Strott requests that the court use a 6% interest rate, which is the default rate of interest under Pennsylvania law. *See* 41 PA. CONS. STAT. § 202. Defendants have made no suggestion with

regard to an interest rate. The Court therefore, will direct that Strott submit a fee petition detailing interest, attorney fees and costs to which he may be entitled under 29 U.S.C. § 1132 (g). The parties should include argument over a proper interest rate to be applied: the default rate of interest under Pennsylvania law; the statutory rate under 28 U.S.C. § 1961[9]; or, if applicable, a rate specified in the Plan.

## V.    CONCLUSION

Based on the foregoing, the Court finds that Defendants' denial of Strott's continuing long term disability benefits under the Plan was arbitrary and capricious. Therefore, Defendants' motion for summary judgment shall be denied, and Strott's motion for summary judgment shall be granted. An appropriate order follows.


s/ David Stewart Cercone
David Stewart Cercone
United States District Judge


cc:    Joseph P. McDonald, Esquire
Tybe A. Brett, Esquire
Mark D. Shepard, Esquire
Amanda A. Sonneborn, Esquire
Shelley Renee Hebert, Esquire
Megan E. Troy, Esquire
Ashley R. Passero, Esquire

(*Via CM/ECF Electronic Mail*)

---

[9]    The statute provides an interest rate "equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of judgment." 28 U.S.C. § 1961.